[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action asking that a marriage be dissolved. All jurisdictional requirements for its maintenance have been met.
It is a complicated case. The plaintiff, Cheryl Schult, appeared pro se, after her original counsel withdrew from the case. She was then represented by Professor Carolyn Wilkes Kaas, of the Bridgeport School of Law Civil Clinic, who was assisted by Susan S. Cartier and Ronald De Mattei, Legal Interns in the School. Linda P. Dunphy represented the defendant Jeffrey Schult. John Bennett represented Joan Radin, the plaintiff's mother, an intervenor. Elizabeth Gleason was appointed guardian ad litem for the minor child, Kellen Schult, and entered an appearance for him in that capacity. Finally, Collette Griffin was appointed counsel for Kellen Schult, which appointment she accepted. CT Page 1553
The action was filed in court on March 7, 1991. It was referred to the undersigned on April 16, 1993 for hearing. Trial of the matter began on November 1, 1993 and was concluded on December 22, 1993, after twenty-five (25) days of hearings. Fifteen (15) witnesses testified. Thirty-eight (38) exhibits were introduced in evidence and the court took one-hundred-seventy-five (175) pages of notes.
Cheryl Schult and Jeffrey Schult intermarried on February 14, 1986 in Sherman, Connecticut. Their child, Kellen, was born on October 6, 1988. The court finds that the marriage has broken down irretrievably with no hope of reconciliation. The defendant's drinking apparently was a major cause of the breakdown. The court dissolved the marriage on December 22, 1993, the last day of the hearings, but made no other rulings as to any of the issues in the action on all of which it retained jurisdiction.
On January 3, 1992, John Bennett entered his appearance for Joan Radin, as an intervenor by reason of her being the maternal grandmother of the child, Kellen. That same day, Judge Karen Nash-Sequino, after a hearing covering custody of Kellen, among other matters, ordered:
 "I'm going to say that this was the attorneys agreement. That there would be joint legal custody in the mother and the maternal grandmother with primary physical residence with the maternal grandmother."
Jeffrey Schult had moved out of the family house in Oxford on April 18, 1991, a month after the action was filed in court. That same day, Steve Norman moved into the family house as a boarder. He had been married and divorced and made the acquaintance of Cheryl and Jeffrey Schult at a bowling alley where he worked. His relationship with Cheryl after he moved into the house became romantic and a child, Aren, was born to them in May 1993.
From April 8, 1991 to November 19, 1991, during the time while Steve Norman was living in the family home, Kellen sustained six instances of trauma of varying kinds. On the night of November 19, 1991 Cheryl was working as an LPN. She had left for work at 6:30 PM. Steve and Kellen were alone in the family house. Kellen had gone to bed in the bedroom in the evening and Steve was watching television. Steve testified that about 5 minutes after Kellen had CT Page 1554 gone to bed he came out of the bedroom crying and said "Boo-Boo", that Kellen had a mark above his eye, that he put an ice pack on the mark, that after 15 to 20 minutes Kellen stopped crying and went back to bed. Steve called Cheryl and told her this. She called [back about 3:30 AM and was told Kellen was sleeping comfortably. At 6:00 AM Cheryl called again to wake Steve up. He prepared Kellen's cereal and woke him up. He noted that Kellen was limping. Kellen was dressed and sat in his chair to eat but then refused to get out of the chair. When Cheryl came in at 7:30 AM, Steve told her that "we've got a problem", that Kellen won't get out of the chair, and won't put pressure on his leg. Cheryl called Dr. Carol Laugel, their pediatrician, who was in her office in Bridgeport. They then took Kellen in Cheryl's car to the Doctor's office and told her Kellen had fallen out of bed. After examining Kellen, Dr. Laugel stated that "it looks like a broken leg", that she felt there was some abuse involved, that they had better bring Kellen to Bridgeport Hospital where an investigation would be made for child abuse; that this accident was one too many. She told them to go to the Hospital and she would be there very shortly. Instead of doing that, Cheryl called Joan who told her to go to a doctor, perhaps at Newington or at Farmington. Cheryl and Steve then went to the University of Connecticut Health Center — John Dempsey Hospital where Kellen was admitted on November 20, 1991.
The relevant parts of the Discharge Diagnosis of the John Dempsey Hospital dated November 25, 1991 reads:
 PHYSICAL EXAMINATION: The physical exam on admission was significant for dry, cracked lips, bruises under the left eye and on the left hand dorsum about 5 x 5 cm in size, swollen right fourth digit with decreased flexion, left knee warm with decreased range of motion, left medial thigh with abrasion 5 cm above the knee, and bruising of the lateral aspect of the left thigh.
 A bone scan showed recent fracture of the left proximal tibia in the area of the growth plate. This fracture is also noted on x-ray. The bone scan also showed increased uptake in the distal ulna and in the CT Page 1555 fourth digit of the right hand. The left leg was splinted by Orthopaedics, and the patient was kept on bedrest.
The fracture was described in the Diagnostic Radiologic Report as:
 "AP and lateral radiographs of the left tibia and fibula including the knee demonstrate a non-displaced spiral metaphyseal fracture. There is a plaster cast supporting-the leg. The alignment of the fragments is anatomic. No other fractures or dislocations are seen."
Another sheer of the hospital records which is not titled, has drawn on it the location of the bruises on Kellen's face and hands, and the specific location of the fracture.
All these documents are found in Plaintiff's Exhibit H.
Steve said that after one, two or three hours at the hospital he decided to leave. He told Cheryl he had to go home and feed the animals. He was driving Cheryl's car. That evening about 8:45 PM he checked into the Days Inn Motel in Stratford. The next day he went to New York City, drove around and came back to the motel for the night. This was on Thursday, November 21. On Friday November 22, he headed for Massachusetts and went to Boston. He came back late in the evening and checked into McDonald's in Devon; where he watched TV and called his mother. On Saturday November 23, three days later, he went back to the John Dempsey Hospital in Farmington.
The court notes that Steve was acting like a man with something on his mind. He left the hospital as soon as he could. He did not go back to the house in Oxford where Kellen had been injured. He checked into and stayed at motels in Milford and Stratford and spent his days driving aimlessly to New York City and Boston. He did not even telephone Cheryl and tell her where he was. He testified he wanted to get away and think about what was going to happen to him. Cheryl said that she called various places looking for him but could not locate him.
The court also noted Steve's demeanor when he testified. After he had been on the stand for a short time he started to cough. It was a small barely audible cough. The court then noted each cough CT Page 1556 with a mark in the margin of its notes. On direct examination he coughed fifty-six times. On cross examination by Linda Dunphy, he coughed six times. On cross examination by John Bennett he coughed eight times. On cross examination by Collette Griffin he coughed eleven times. When he was excused the court noted that he hurried out of the courtroom, looking neither to the right nor the left. He did not speak to anyone. He was a very nervous witness.
The court finds as a fact that Kellen's leg was broken by Steve, that Steve told Cheryl when she came home what he had done and they both decided to tell the story that Kellen's leg was broken while Kellen was alone in the bedroom in bed. When they told Dr. Laugel they did not know what happened to Kellen, Dr. Laugel told them that she felt there was some abuse involved and that an investigation would be made for child abuse. They did not follow the doctor's order to go to the Bridgeport Hospital but went eventually to the John Dempsey Hospital in Farmington. Steve left that hospital as soon as he could and testified that he wanted to get away, that he did not know what was going to happen to him. Under these circumstances, it is clear that it would not be in the best interest of Kellen for him to be given into Cheryl's custody with Steve there, knowing that he got away with breaking Kellen's leg as the court has found and with the opportunity to abuse Kellen further. The court cannot conceive of a situation more detrimental to Kellen to permit Cheryl to have custody of Kellen now. Under the above circumstances, Cheryl sided with Steve against Kellen. She should not be given the opportunity to do that again.
The court is aware that Kellen likes Steve and will be in Steve's company whether or not the court issues any order against that. The experience as to that point is that it is a waste of time for the court to order Steve not to be present when Kellen is with Cheryl.
However, if anything happens to Kellen at any time and Joan Radin believes that there is a question about abuse while Kellen is with Steve and Cheryl, a motion by her raising the question will be given an immediate hearing by the court and an order if warranted will issue appropriate to the circumstances. The court will retain jurisdiction on the matter for any such problem.
No one suggested that Kellen be called as a witness and, considering Kellen's background, the court would not have allowed him testify. The court notes that Kellen liked Steve and inquired about him when Steve was not around; and also notes that Kellen CT Page 1557 showed no fear of Steve. It is a fact that apparently children under similar circumstances do not blame their abusers for injuries inflicted on them or show fear of such abusers afterwards.
Custody of Kellen is awarded solely, to Joan Radin, his grandmother. The court is aware of 46b-56b which reads:
 "In any dispute as to the custody of a minor involving a parent and a non-parent, there shall be a presumption mat it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to nave custody."
Cheryl and Jeffrey, shall have rights of reasonable visitation with Kellen. The present arrangement seems satisfactory. Both shall have the right to consult with Joan Radin on all and any matters concerning Kellen's health, and well being but the ultimate decision in any such problem shall be made by Joan Radin.
Jeffrey is ordered to pay support to Joan Radin for Kellen in the amount of $106.00 per week. Cheryl shall pay $1.00 a week for such support until she resumes employment at which time she shall so advise the court and, after hearing, the court will issue revised orders as to support for Kellen.
In as much as Cheryl is cohabiting with Steve, she is not awarded alimony.
Each attorney shall be paid legal fees and expenses by their own clients. Collette Griffin's fees shall be paid by Cheryl and Jeffrey to the extent of their financial abilities.
The court will retain jurisdiction in the matter to assist in resolving an problems that are not addressed above and which might arise in the future.
THOMAS J. O'SULLIVAN, TRIAL REFEREE
[EDITORS' NOTE: THE CASE THAT PREVIOUSLY APPEARED ON THIS PAGE HAS BEEN MOVED TO CONN. SUP. PUBLISHED OPINIONS.] CT Page 1558
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1559
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1560
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1561
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1562
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 1563